**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2019 IL App (3d) 180060-U

Order filed November 19, 2019

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2019

| | | |
|---|---|---|
| ENBRIDGE ENERGY, LIMITED PARTNERSHIP, a Delaware Limited Partnership, | ) ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois. |
| Plaintiff-Appellee/Cross-Appellant, | ) ) | |
| v. | ) ) | |
| VILLAGE OF ROMEOVILLE, an Illinois Municipal Corporation, and OLDCASTLE APG SOUTH, INC., d/b/a NORTHFIELD BLOCK COMPANY, a Delaware Corporation, | ) ) ) ) ) | |
| Defendants | ) ) | Appeal Nos. 3-18-0060 3-18-0078 Circuit No. 11-L-727 |
| (Village of Romeoville, an Illinois Municipal Corporation, | ) ) | |
| Defendant-Appellee, | ) ) | |
| and | ) ) | |
| Oldcastle APG South, Inc., d/b/a Northfield Block Company, a Delaware Corporation, | ) ) ) | |
| Defendant-Appellant/Cross-Appellee). | ) | Honorable Barbara N. Petrungaro, Judge, Presiding. |

PRESIDING JUSTICE SCHMIDT delivered the judgment of the court.
Justices Carter and McDade concurred in the judgment.

**ORDER**

¶ 1      *Held*:   The trial court erred by failing to grant judgment notwithstanding the verdict in favor of defendant, Northfield Block Company. The trial court did not err in granting summary judgment in favor of defendant, Village of Romeoville.

¶ 2      This case concerns a $45,491,625 judgment for damages resulting from the release of crude oil in Romeoville, Illinois, in favor of plaintiff, Enbridge Energy, Limited Partnership and against defendant, Oldcastle APG South, Inc., d/b/a Northfield Block Company, on a breach of contract claim.

¶ 3      Defendant raises multiple contentions on appeal, asserting that either reversal of the trial court's denial of its motion for judgment notwithstanding the verdict or a new trial is required because (1) plaintiff's breach of contract claim was based on evidence of improper installation of the water service line, which is barred by the statute of repose; (2) the trial court improperly admitted evidence of prior leaks in its water service line; (3) the jury found plaintiff failed to fulfill all of its obligations under the parties' easement agreement; (4) the trial court erred by refusing to give a special interrogatory; and (5) the trial court erred by instructing the jury that defendant owed plaintiff a duty.

¶ 4      Plaintiff cross-appeals, maintaining that (1) the trial court erred in denying its request for prejudgment interest on its damages for breach of contract and (2) judgment should be entered in its favor on defendant's affirmative defense of contributory negligence. In reply, defendant asserts that this court lacks jurisdiction to consider plaintiff's cross-appeal concerning the jury's contributory negligence verdict because (1) no judgment was ever entered on that verdict and (2) it is an impermissible contingent appeal.

¶ 5        Plaintiff also filed a contingent appeal as to a second defendant, the Village of Romeoville (Village), maintaining that the trial court erred in granting the Village's renewed motion for summary judgment because disputed issues of material fact precluded it. However, plaintiff asserts that we need not consider its contingent appeal if we affirm the judgment against defendant.

¶ 6        We reverse in part and affirm in part.

¶ 7                                I. BACKGROUND

¶ 8        At the outset, we note that the record in this case is voluminous. Further, the large size of the electronic documents makes it difficult to access the record and nearly impossible to navigate within each document once accessed. While we have reviewed the record, we rely largely on the parties' recitation of the facts relevant to this appeal.

¶ 9                        A. Factual Background and Pretrial Proceedings

¶ 10       Plaintiff operates crude oil pipelines throughout the United States. Defendant, a unit of Oldcastle, Inc., manufactures concrete products such as landscaping blocks.

¶ 11       In 1968, plaintiff assumed control of a 34-inch diameter high-grade steel, oil pipeline known as "Line 6A" installed earlier that year by its predecessor. The pipeline wall is over a quarter-inch thick and the exterior of the pipe is insulated with a tape coating. Line 6A runs from Superior, Wisconsin, to Griffith, Indiana, carrying 450,000 barrels of oil a day. Part of the pipeline passes through Romeoville, Illinois, pursuant to a written easement agreement entered into between the parties' predecessors. The easement granted plaintiff a "right-of-way and perpetual easement to construct, operate, maintain, inspect (including aerial patrol), remove, replace and reconstruct one or more pipelines *** for the transportation of oil." It also granted defendant "the right at any time to install parking lots, driveways, streets, utilities, drainage systems, sewers and water lines in, over, under and across the easement, provided such use of the right of way does not

- 3 -

unreasonably interfere with the operation of the pipelines." The oil pipeline runs directly under the Village's Parkwood Avenue, parallel to a water main owned and operated by the Village.

¶ 12    In 1977, defendant's predecessor installed a six-inch diameter, ductile cast iron water service line with a cement lining to provide an industrial-level supply of water (85 pounds per square inch) to its building located at 717 Parkwood Avenue. The water service line is approximately 800 feet long with a majority of the line located on defendant's property. The water service line ran perpendicular to and approximately six inches below plaintiff's oil pipeline. In 1992, defendant purchased the property located at 717 Parkwood Avenue. In 2003, Oldcastle APG South, Inc., purchased defendant.

¶ 13    On the morning of September 9, 2010, a neighboring business of defendant reported a water leak on defendant's driveway apron where it met Parkwood Avenue. A few hours later, witnesses observed crude oil bubbling to the surface at the same location. Once notified of the oil leak, plaintiff shut down its oil pipeline and sent crews to the scene to contain the leak. In the weeks and months that followed, plaintiff paid in excess of $40 million to remediate the oil leak.

¶ 14    When the oil and water pipelines were excavated, a 1½-inch hole was found on the bottom of the oil pipeline that was located directly above where defendant's water service line crossed below the oil pipeline. The water service line was corroded and had three large holes directly below the hole on the oil pipeline.

¶ 15    In December 2013, plaintiff filed an eight-count second amended complaint against defendant and the Village raising claims of negligence (counts I, IV); negligent trespass (counts II, V); intentional trespass (counts III, VI); breach of contract (count VII); and fraud (count VIII). In relevant part, plaintiff claimed that defendant (1) neglected its duty to maintain its water line in a condition which would prevent damage to the property of others (count I); (2) negligently

trespassed when water from its water service line leaked into plaintiff's right-of-way (count II); (3) intentionally trespassed into plaintiff's right-of-way because defendant knew that its water service line had a "longstanding history" of leaking (count III); (4) breached the easement agreement when it impeded or interfered with plaintiff's operation of the oil pipeline (count VII); and (5) submitted fraudulent invoices to plaintiff claiming that it had to close its manufacturing plant as a result of the oil spill (count VIII). Defendant denied all material allegations and asserted contributory negligence and failure to mitigate as affirmative defenses.

¶ 16　　　　The parties then engaged in substantial pretrial motion practice, including the filing of cross-motions for summary judgment and multiple motions *in limine*. On August 10, 2016, the trial court granted the Village's renewed motion for summary judgment. Also relevant to this appeal, the court (1) denied defendant's motion *in limine* to bar plaintiff from offering evidence of prior leaks in the water service line; (2) granted plaintiff's motion *in limine* to exclude evidence of other oil pipeline spills; and (3) denied defendant's motion *in limine* to bar plaintiff from offering evidence related to the installation of the water service line, but all parties agreed that the court would give a limiting instruction to the effect that defendant was not responsible for the installation of the water service line.

¶ 17　　　　　　　　　　　　　　　B. The Jury Trial

¶ 18　　　　The two week trial commenced in June 2017 and included the following evidence.

¶ 19　　　　Plaintiff's oil pipeline is protected from corrosion via an external coat of tape wrapping and by a cathodic protection system which emits a low level of electricity along the pipeline. Defendant's ductile cast iron water service line has no external coating and was not protected by a cathodic system. Following the water and oil leaks at issue here, both lines were excavated. The portion of the water service line at issue, which was located approximately six inches below the

oil pipeline, showed evidence of corrosion and had three holes on the top of the water line. Other sections of the water service line surrounding the holes appeared to be in good condition. The oil pipeline appeared to be in good condition, except that the bottom of the oil pipeline, which was located directly above the water service line, had a round 1½-inch diameter hole with the edges pushed inward where it was penetrated by a jet of water from the water service line that had entrained surrounding soil material. In addition, the tape coating around the oil pipeline was missing or torn from the area surrounding the hole.

¶ 20                                 1. *Plaintiff's Evidence*

¶ 21            Plaintiff's expert in metallurgy, Dr. John Beavers, inspected both the oil pipeline and the water service line and observed that the hole on the top of the water service line aligned perfectly with the hole on the underside of the oil pipeline. He also observed that the tape coating on the oil pipeline was damaged and falling off, accompanied by gouge marks on the underside of the oil pipeline in the area of the hole. He believed this damage occurred during the installation of the water service line in 1977.

¶ 22            He further testified that the oil pipeline failed as a result of erosion caused by the water jet from defendant's corroded water service line. In particular, Beavers believed that electric current from the oil pipeline's cathodic protection system escaped as a result of the damage to the tape coating that occurred during the installation of the water service line. The stray current then bounced between the two pipelines eventually corroding the water service line. In his opinion, the corrosion to the water service line would have been less severe if the distance between the two lines were greater. Beavers described this as a "very rare" and "unusual occurrence" which had happened only one other time in his 44 years of experience.

¶ 23    Paul Fleming, an expert in water systems, agreed with Beavers that the water service line corroded due to stray electrical currents from a cathodic protection system in the area. He also agreed that the oil pipeline probably failed due to the eroding effect of the water jet from the water service line. Like Beavers, Fleming stated that the conditions leading up to the failure were "unusual" and "rare."

¶ 24    Fleming also testified that the water service line had leaked seven times between 1995 and 2009, a number he described as "highly excessive." While Fleming could not identify the locations or the causes of any of the prior leaks, he acknowledged that at least three of the leaks occurred near defendant's building, approximately 500 feet away from the site of the oil leak. Although he opined at trial that these leaks were relevant, he admitted testifying in his deposition that any leaks near defendant's building had little relevance to the corrosion of the water service line under Parkwood Avenue. Fleming believed the water service line leaked in this instance due to corrosion caused by stray currents from cathodic protection.

¶ 25    Daniel Bromberek, the Village's director of public works, worked for the Village for 32 years. Prior to the September 2010 incident, he did not know the depth of the oil pipeline, the water service line, or the length of separation between the two. He observed the excavation of the pipelines following the leak. Aside from the corroded portion of the water service line located directly beneath the oil pipeline, the water service line appeared undamaged. The previous water leaks he knew of occurred near defendant's building. He was unaware of any prior leaks under Parkwood Avenue.

¶ 26    Richard Adams, plaintiff's former president of operations, testified that plaintiff ran in-line inspections to test its oil pipelines every year or two and that it conducted periodic aerial patrols, none of which revealed any problems in the area. He confirmed that plaintiff used cathodic

protection around its oil pipeline. Plaintiff notified landowners near the oil pipeline of the pipeline's existence annually. Plaintiff also marked the location of the pipeline with above ground markers which also included contact information in case of an emergency. Adams had viewed the excavation of the pipelines and noted that the oil pipeline failure was "unique."

¶ 27      Michael Price, a right-of-way agent for plaintiff, testified that plaintiff used pipeline markers on the sides of road crossings, water crossings, and property lines to identify the location of its pipelines. Plaintiff documented the locations where utilities and facilities owned by other companies crossed its oil pipeline, but defendant's water service line was not documented on plaintiff's 2010 alignment sheets. Price also testified that plaintiff was a member of the Joint Utility Locating Information for Excavators (JULIE), an organization that provides excavators with on-demand information concerning utility assets, since 1983.

¶ 28      Gary Sommers, plaintiff's facility integrity specialist, testified that between 2000 and 2016, plaintiff ran eight in-line inspections of its pipeline and found no irregularities. According to Sommers, plaintiff was unaware of the water service line. On cross-examination, Sommers acknowledged that a 2008 in-line inspection detected an anomaly, or metal in close proximity to the oil pipeline at 717 Parkwood Avenue, but agreed that plaintiff did not conduct any further inspection or investigation into the anomaly. The 2008 in-line inspection found approximately 667 metal objects in close proximity to the oil pipeline.

¶ 29      Wayne Wright, the vice president of plant support for defendant, testified as an adverse witness. He was unaware of any inspections being conducted on the water service line prior to September 2010.

¶ 30      Paul Yungmann, a site manager in defendant's maintenance department, testified that he was unaware of any steps taken by anyone at defendant's direction to ensure that the water service

line remained in good condition. He was also unaware of any policies with respect to conducting regular inspections of the water service line.

¶ 31        Derek Shelton worked for Water Services, a water meter distributor that provides leak detection services. Shelton explained the procedure used to detect and survey water leaks. On September 9, 2010, defendant called Shelton to locate a water leak beneath Parkwood Avenue. Using specialized equipment, he was able to detect a leak 30 feet east of the valve beneath Parkwood Avenue. On cross-examination, Shelton admitted that he did not remember the exact location of the leak and conceded that his proffered location of the leak could be incorrect due to the vibrations from the oil leak. He further explained that it is typical for municipalities to retain his company for leak detection. While he had done leak testing on a water line for an industrial building when a leak was not suspected, it was rare to test lateral service lines unless when testing main lines, a leak was detected. He acknowledged that his equipment could not detect corrosion but only existing leaks. To his knowledge, there were no federal or state laws that required either a municipality or a private landowner to conduct leak detection surveys.

¶ 32                                *2. Defendant's Evidence*

¶ 33        Gerald Dewitt, plaintiff's senior cathodic protection specialist, testified as an adverse witness as follows. Plaintiff protected its oil pipeline from corrosion by using a cathodic protection system which injects electrical current into the ground. Federal guidelines require 12 inches of separation between pipelines although plaintiff preferred 3 feet of separation. In 2009, plaintiff installed additional electrical anodes over its oil pipeline in Romeoville as part of its cathodic protection system but did not adequately document the presence of the anodes on its alignment sheets.

¶ 34    Dr. Alfred Pettinger, an expert on pipeline failures, testified as follows. Defendant's water service line became damaged as the result of stray electrical current. The electrical current from plaintiff's cathodic protection traveled to the area where the oil pipeline coating was damaged then strayed over to defendant's defenseless water service line creating "an electric galvanic reaction which basically cause[d] iron to become converted to iron oxide [*i.e.*, rust], which is corrosion." The stray current took approximately 33 years to corrode the water service line and cause the accident. Further, the quality of plaintiff's tape coating on the pipeline and the damage to that tape were the most significant contributing factors to the oil leak.

¶ 35    Pettinger further testified that an oil pipeline operator has a duty to minimize damage to other pipelines caused by its cathodic protection system. The oil pipeline operator must know of crossings with other lines, conduct patrols over the right-of-way, inspect the pipeline and keep records of the pipeline's location and any other facilities located near it. Pettinger stated that Romeoville is a "high consequence area" that requires a "higher standard" of care from the oil pipeline operator. In his opinion, plaintiff met the "absolute minimum" standard of care, but stated it should have discovered the existence of the water service line at some point during the last 30 years.

¶ 36    Chris Drey, the Village's former water superintendent, did not know the exact location of the oil pipeline underneath Parkwood Avenue; he did not know that it intersected with the water service line. Plaintiff failed to provide him with requested information regarding the exact location of its oil pipeline. Drey stated that water leak detections are generally conducted in response to discrepancies in a water audit or when water is observed on the surface rather than as a matter of course. On cross-examination, Drey acknowledged that he could have called JULIE to determine the location of the oil pipeline, but he clarified JULIE is used for digging projects and emergency

- 10 -

situations, not for marking utilities in the community at large. Finally, Drey stated that the public brochures sent out by plaintiff expressly state that its pipeline markers should not be used as a reference for the exact location of the pipeline.

¶ 37    Defendant's site manager, Leonard Lee, testified that he never received any pamphlets, brochures, or any other written documents from plaintiff regarding its oil pipeline. Lee knew the oil pipeline ran beneath defendant's property, but he was unaware of its exact location. Lee further stated that he did not maintain the water service line and he was unaware of any steps taken by defendant to ensure the water line remained in good repair.

¶ 38    George Huth, a former crossing coordinator for plaintiff, testified that his primary responsibility was to respond to JULIE requests and determine the location of the oil pipeline in relation to the requestor's potential work. In order to determine the location, he consulted the information contained on plaintiff's alignment sheets, which he explained are maps containing the oil pipeline's location in relation to roads, utilities, and installations.

¶ 39    Michael Price, plaintiff's right-of-way specialist, acknowledged that plaintiff could have, but did not, conduct walking and driving patrols of its oil pipeline as part of its maintenance protocol. Price agreed that no facilities or utilities were marked on plaintiff's alignment sheet.

¶ 40    Troy Toweson, also a crossing coordinator for plaintiff, observed the excavation of a sewer line located near the oil pipeline in 2009. Toweson agreed that the sewer line was not documented on plaintiff's alignment sheet and he did not file a crossing report to update the alignment sheet to show its existence.

¶ 41    Harry Rossio, a laborer for the Village, repaired a sewer backup on defendant's property in January 2009. The repair required excavation of the area around the sewer line approximately seven feet from plaintiff's oil pipeline. Rossio stated that one of plaintiff's employees monitored

the repair. During the repair, defendant's water service line was plainly visible; Rossio stated it appeared to be in good condition.

¶ 42   John Talbot, a civil engineer, testified that no evidence connected the causes of the prior water service line leaks to the condition that caused the leak at issue. He reviewed the Village's work orders for the prior leaks and determined that three of them occurred along the face of defendant's building, approximately 600 feet away from the location of the later leak. He had no information regarding the location or cause of the other water line leaks. Talbot was unsure whether defendant performed proactive maintenance of the water service line, but he noted defendant was not required to perform leak detection services without evidence of a water leak. In his opinion, no proactive maintenance of defendant's water service line would have detected a leak beneath Parkwood Avenue before it occurred. However, Talbot did agree that the overall condition of a water service line can be indicated by the frequency of leaks.

¶ 43                               3. *Rebuttal Evidence*

¶ 44   On rebuttal, Shane Finneran, a senior engineer for the Computational Modeling Group, testified as an expert in analyzing corrosion from stray electrical current. He rejected Pettinger's conclusions that the oil spill resulted from improper installation of the water service line in conjunction with plaintiff's cathodic protection system emitting stray current. Finneran described Pettinger's method as oversimplified. He further stated that the mathematical equation Pettinger used to gauge plaintiff's stray electrical current was not a method generally used in the industry to analyze stray current. Finneran noted that other sources in the area, other than plaintiff and Nicor, used electrical current and that Pettinger failed to consider these other sources in his calculation. In Finneran's opinion, the levels of Nicor and plaintiff's current calculated by Pettinger were too low on their own to cause the level of corrosion observed on the water service line in just 33 years.

According to Finneran, it was impossible to determine what caused the water service line to corrode but that any corrosion related to plaintiff's cathodic protection system would be negligible. On cross-examination, Finneran acknowledged that the modeling method Dr. Pettinger employed is sometimes used in the industry for preliminary design assessments of cathodic protection systems.

¶ 45                    C. The Instructional Conference, Verdict, and Judgment

¶ 46        Prior to closing arguments, the trial court granted plaintiff's oral motion for leave to amend its breach of contract claim over defendant's objection. The court also ruled that defendant owed a duty to plaintiff as a matter of law under a Village ordinance and instructed the jury accordingly. The court then refused a special interrogatory submitted by defendant that would have inquired whether the jury believed the corrosion to the water service line was the result of acts and omissions that occurred during its installation.

¶ 47        Thereafter, the jury returned a verdict for plaintiff on its negligence, negligent trespass, and breach of contract claims but found plaintiff 45% contributorily negligent on its negligence-related claims. At plaintiff's election, in July 2017, the trial court entered a judgment in plaintiff's favor only on the breach of contract claim in the amount of $45,491,625. In September 2017, plaintiff filed a motion for judgment notwithstanding the verdict on defendant's affirmative defense of contributory negligence. Also, in September 2017, defendant filed a posttrial motion that requested a judgment notwithstanding the verdict on the negligence, negligent trespass, breach of contract claims, and, alternatively, a motion for a new trial. In January 2018, the court denied all posttrial motions.

¶ 48        Defendant appeals. Plaintiff cross-appeals as to defendant and filed a contingent cross-appeal as to the Village.

¶ 49                                    II. ANALYSIS

¶ 50                                 A. Defendant's Appeal

¶ 51        Defendant first asserts that the trial court erred in denying its motion for judgment notwithstanding the verdict on plaintiff's breach of contract claim because plaintiff presented no admissible evidence of defendant's alleged insufficient maintenance of the water service line. In the alternative, defendant contends that it is entitled to a new trial because the court improperly admitted evidence of prior water leaks.

¶ 52        We review *de novo* a trial court's ruling on a motion for judgment notwithstanding the verdict. *Thornton v. Garcini*, 382 Ill. App. 3d 813, 817 (2008).

> "A motion for judgment notwithstanding the verdict should only be granted in those limited cases where all of the evidence and the inferences therefrom, viewed in the light most favorable to the nonmoving party, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand." *Id.*

We may not reweigh the evidence, make credibility determinations, or substitute our judgment for the jury's merely because the jury could have drawn other inferences or conclusions or because this court believes another result to be more reasonable. *Id.*

¶ 53        Defendant asserts that the judgment in favor of plaintiff on its breach of contract claim must be reversed because plaintiff presented no admissible evidence of defendant's alleged insufficient maintenance of its water service line. Specifically, defendant maintains that "[n]early all of [plaintiff's] evidence *** related to installation errors" is barred by the statute of repose and that "the slight maintenance-related evidence plaintiff did muster was erroneously admitted into evidence, leaving the judgment without any valid record support." According to defendant, the

installation error evidence and the prior leak evidence were the only evidence advanced by plaintiff that could support its claims. "In other words[,] without this inadmissible evidence, [plaintiff] had no case." Defendant then asserts that the contract claim presented by plaintiff is a "thinly-veiled version of the same claims barred by the statute of repose."

¶ 54    In reply, plaintiff contends that it need not show defendant failed to maintain its water service line to prevail on its breach of contract claim. Rather, plaintiff contends that the very fact that defendant's water service line leaked and "drilled a hole into plaintiff's oil pipeline" is sufficient, on its own, to show defendant breached its contractual duty to ensure that the water service line did not "unreasonably interfere with the operation of [plaintiff's] pipelines."

¶ 55    Initially, we reject plaintiff's strict-liability type contention. Plaintiff cites no authority, nor did our research reveal any, that would support a finding of unreasonable interference of an easement based solely on an underground water leak and the subsequent damage that results. Further, plaintiff never pursued this claim below. At trial, plaintiff based its breach of contract claim on defendant's alleged failure to maintain the water service line. In fact, plaintiff's proposed jury instruction for its breach of contract claim stated that "[plaintiff] has the burden of proving *** [defendant] breached the *** easement agreement in the following ways. By failing to maintain the water service line so that it would not unreasonably interfere with [plaintiff's] operation of Line 6A." Thus, in order to prevail on its breach of contract claim, plaintiff bore the burden of proving that defendant failed to maintain the water service line so that it would not unreasonably interfere with the oil pipeline. The evidence presented showed that the water line leak was caused by corrosion from stray current emanating from Enbridge's pipeline and was not the result of deficient maintenance.

¶ 56    We need not decide if the contract claim was barred by the statute of repose because plaintiff failed to meet its burden. In reviewing the evidence introduced by plaintiff, we turn first to that of prior leaks. Evidence of prior occurrences is admissible to establish notice of a dangerous condition. *Rucker v. Norfolk & Western Ry. Co.*, 77 Ill. 2d 434, 441 (1979). The prior occurrences need only be substantially similar to the accident in question; they need not be identical. *Id.* "To make the proof of other independent accidents competent, the condition or thing shown to be the common cause of danger in such accidents must be the condition or thing contributing to the danger of the accident complained of." *Moore v. Bloomington, Decatur & Champaign R.R. Co.*, 295 Ill. 63, 67 (1920). It is within the trial court's discretion to decide whether evidence is relevant and admissible, and a reviewing court will not disturb the trial court's decision absent a clear abuse of that discretion. *In re Marriage of Bates*, 212 Ill. 2d 489, 522 (2004). An abuse of discretion occurs only where no reasonable person would take the position adopted by the trial court. *Dawdy v. Union Pacific R.R. Co.*, 207 Ill. 2d 167, 177 (2003).

¶ 57    Here, plaintiff was using the prior leak evidence for the dual purpose of showing a particular danger or hazard and defendant's notice of the generally hazardous nature of the water line. Nonetheless, there was no foundation laid at trial by plaintiff as to the reasonable similarity of the prior leaks and the leak at issue. See *Trimble v. Olympic Tavern, Inc.*, 239 Ill. App. 3d 393, 398-99 (1993) (Evidence of prior accidents in slip and fall case was not admissible to show the existence of a particular danger because "the plaintiff did not establish, as a foundation, the similarity between the prior accidents and her own."). No one identified the exact locations of these prior leaks or their causes. It was shown at trial that the causes and origins of the prior leaks have eluded the parties and none of the evidence proves that the previous water leaks were caused by corrosion from stray current or from the general deterioration of defendant's water line.

Plaintiff's own expert acknowledged that at least three of the prior leaks occurred near defendant's building, more than 500 feet away from the site of the incident at issue. One of plaintiff's experts even admitted during his deposition that these three leaks were not relevant to the corrosion of the water service line producing a water jet that caused the hole in the oil pipeline. See Ill. R. Evid. 402 (eff. Jan. 1, 2011) ("Evidence which is not relevant is not admissible."). The trial court abused its discretion in admitting the prior leak evidence.

¶ 58        Plaintiff argues that even without the evidence of prior leaks on the water service line, the record sufficiently shows defendant did "absolutely nothing to maintain its water service line."  In support of its contention, plaintiff cites to the testimony of three of defendant's employees who allegedly testified that defendant "did *absolutely nothing* to maintain its water service line." Plaintiff misrepresents the testimony. According to our review of the record, these witnesses merely testified that *they* were unaware of any regular inspections of the water service line to ensure the line remained in good repair. Further, plaintiff presented no evidence to show that it is standard practice to routinely inspect water service lines to ward off future leaks; nor did it present any evidence to show what such inspections would entail. There was testimony that it is rare to perform inspections on lateral water service lines, such as the line at issue, unless a leak is detected during the inspection of the main line. The only real evidence that plaintiff submitted to support its claim was that defendant's water service line leaked 7 times in the 15 years preceding the oil spill, which, as explained above, was inadmissible.

¶ 59        Moreover, plaintiff's experts testified that the water leak would not have occurred but for the damage to the tape coating on the oil pipeline that occurred during the installation of the water service line. As a result of the damage to the tape coating, stray current from plaintiff's cathodic protection system escaped, bounced between the two pipelines at their intersection, eventually

corroding the water service line which, in turn, released a jet of water that bored a hole into the oil pipeline above it. This evidence relates solely to the installation of the water service line by defendant's predecessor and is barred by the statute of repose. See 735 ILCS 5/13-214(b) (West 2016) (No action based on contract may be brought against any person for an act or omission of such person in the construction of an improvement to real property after 10 years have elapsed from the time of such act or omission.). Thus, this evidence cannot be used to support plaintiff's contract claim.

¶ 60       Even assuming the admission of the prior leak evidence was proper, plaintiff failed to prove that defendant's insufficient maintenance of its water service line caused the oil pipeline to fail. Plaintiff's own evidence and experts indicate the culmination of this incident was the result of a series of events started when the water line was installed in 1977, not deficient maintenance. In its case in chief plaintiff put on two experts, Beavers and Fleming, who testified that stray current from the damaged oil pipeline corroded the water line resulting in the water leak. On rebuttal plaintiff put an additional expert, Finneran, on the stand. Finneran's testimony contradicted not only defendant's expert, Pettinger, but both Beavers' and Fleming's testimony. By presenting testimony from an expert in rebuttal that contradicted testimony from both experts that plaintiff presented in its case-in-chief, the jury was undoubtedly baffled. Plaintiff's case amounts to smoke and mirrors and as a result, it has not carried its burden. Having found that the prior leak evidence and the installation error evidence are inadmissible, we agree with defendant that plaintiff has no basis on which to base any of its claims.

¶ 61       Because we grant defendant judgment notwithstanding the verdict on the above-mentioned claim, we need not address defendant's remaining contentions on appeal as they are rendered moot.

¶ 62                       B. Plaintiff's Cross-Appeal Against Defendant

- 18 -

¶ 63    In its cross-appeal against defendant, plaintiff first asserts that the trial court erred in denying plaintiff prejudgment interest on its damages for breach of contract. Next, plaintiff contends that in the event we disturb the judgment on its breach of contract claim—which we do— judgment should be entered in its favor on defendant's contributory negligence affirmative defense.

¶ 64    Confronted with plaintiff's request for us to review the negligence verdict, having already contemplated reasonableness in the contract claim, we do so. Plaintiff's claims based in negligence are as equally unsupported as its claims arising from the contract. "It is the plaintiff's burden to allege and prove all of the elements of a negligence claim, including a duty owed by the defendant, a breach of that duty, and that the breach was the proximate cause of the plaintiff's injuries." *Monson v. City of Danville*, 2018 IL 122486, ¶ 23.

¶ 65    Proximate cause is ordinarily a question of fact to be presented to the jury; it can only be decided as a matter of law where reasonable men cannot draw divergent inferences from the undisputed facts. *Novander v. City of Morris*, 181 Ill. App. 3d 1076, 1078 (1989). "The term 'proximate cause' embodies two distinct concepts: cause in fact and legal cause." *Turcios v. The DeBruler Co.*, 2015 IL 117962, ¶ 23. Legal cause is established only when it can be said that the injury was reasonably foreseeable. *Id.* ¶ 24; see also *Suwanski v. Village of Lombard*, 342 Ill. App. 3d 248, 255 (2003) ("[A] negligent act is a legal proximate cause of an injury if the injury is of the type that a reasonable person would foresee as a likely result of his conduct."); *Diehl v. Polo Cooperative Ass'n.*, 328 Ill. App. 3d 576, 582 (2002). ("An injury will be found to be beyond the scope of the defendant's duty if it appears highly extraordinary that the breach of the duty should have caused the particular injury."). "Courts ask whether the injury is the type of injury that a

reasonable person would see as a 'likely result' of his or her conduct, or whether the injury is so 'highly extraordinary' that imposing liability is not justified." *Turcios*, 2015 IL 117962, ¶ 23.

¶ 66    Plaintiff established at trial that the cause of the water leak derived from acts by the defendant's predecessor during the installation of the water service line. Specifically, the lack of spacing between the two lines in conjunction with damage to the oil pipeline's protective coating that allowed stray current to corrode the water line. Defendant did not know, nor did it have reason to know the stray current was corroding the water service line that was installed precariously close to the oil pipeline. Neither defendant nor a reasonable person could have been aware of the possibility that a water leak would result in an oil spill, particularly when experts described the incident as "unusual," "unique," "rare," and "very rare." Additionally, as noted above, it was not established that it is standard practice to routinely inspect water service lines. Even if routine leak detections were conducted, the corrosion of the water service line would not have been discovered. Viewing the remaining evidence in the light most favorable to the nonmovant, it so overwhelmingly favors the movant that the jury verdict cannot stand. See *Mulloy v. American Eagle Airlines, Inc.*, 358 Ill. App. 3d 706, 714 (2005) (" ' "[W]here the evidence presented indicates only a mere possibility that a defendant was negligent, the case must be removed from the jury's consideration," ' and a directed verdict for the defense is proper." ) (quoting *Van Steemburg v. General Aviation, Inc.*, 243 Ill. App. 3d 299, 322 (1993), quoting *Shramek v. General Motors Corp.*, 69 Ill. App. 2d 72, 79 (1966))).

¶ 67    As such, defendant was entitled to judgment notwithstanding the verdict not only on the contract claim but also the claims arising out of negligence. The other issues presented in the plaintiff's cross-appeal are rendered moot due to our finding above.

¶ 68                    C. Plaintiff's Contingent Cross-Appeal Against the Village

¶ 69    In its contingent cross-appeal, plaintiff asserts that the trial court erred in granting summary judgment in favor of the Village because disputed issues of material fact exist concerning the applicability of section 3 of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/3-102 (West 2016)) to the facts of this case. In response, the Village contends that the court properly granted summary judgment because (1) it did not owe a duty of care to maintain the defendant's water service line; (2) it is not liable under section 3-102(a) of the Tort Immunity Act where it did not have actual or constructive notice of the specific dangerous condition that caused plaintiff's injuries; (3) it is entitled to discretionary immunity pursuant to sections 2-201 and 2-109 of the Tort Immunity Act; and (4) plaintiff's claims against the Village are barred by the statute of repose.

¶ 70    "Summary judgment is appropriate when 'the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Illinois State Bar Ass'n Mutual Insurance Co. v. Law Office of Tuzzolino & Terpinas*, 2015 IL 117096, ¶ 14 (quoting 735 ILCS 5/2-1005(c) (West 2010)). We review a trial court's entry of summary judgment *de novo*. *Id.* Further, we may affirm a lower court's ruling on a motion for summary judgment on any basis appearing in the record. *Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 305 (2005).

¶ 71    As a preliminary matter, plaintiff notes that the Village improperly cites and relies on trial testimony to support its summary judgment ruling. We agree that the Village improperly relies and/or cites to some evidence not yet in the record when the trial court granted the Village's renewed motion for summary judgment, namely trial testimony. "[U]pon appellate review of a summary judgment ruling the appellant may only refer to the record as it existed at the time the

trial court ruled, outline the arguments made at that time, and explain why the trial court erred in granting summary judgment." *Raynor Covering Systems, Inc. v. Danvers Farmers Elevator Co.*, 226 Ill. App. 3d 507, 509-10 (1992). Accordingly, we will disregard the portions of the Village's brief that rely on trial testimony absent from the record when the trial court granted the Village's renewed motion for summary judgment on August 10, 2016.

¶ 72    Section 3-102(a) of the Tort Immunity Act provides that "a local public entity has the duty to exercise ordinary care to maintain its property in a reasonably safe condition." 745 ILCS 10/3-102(a) (West 2016)). It further states that the entity "shall not be liable for injury unless it is proven that it has actual or constructive notice of the existence of such a condition that is not reasonably safe in reasonably adequate time prior to an injury to have taken measures to remedy or protect against such condition." *Id.* Essentially, "[t]he Act's purpose is to protect local governments and their employees from liability arising out of the operation of government." *Barr v. Frausto*, 2016 IL App (3d) 150014, ¶ 21.

¶ 73    It is the plaintiff's burden to allege and prove all of the elements of a negligence claim. *Supra* ¶ 64. "Under section 3-102(a), actual or constructive notice of a dangerous condition is an element of a negligence claim." *Monson*, 2018 IL 122486, ¶ 23. "Section 3-102(a) requires proof that the defendant had timely notice of the specific defect that caused the plaintiff's injuries, not merely the condition of the area." *Zameer v. City of Chicago*, 2013 IL App (1st) 120198, ¶ 16. Thus, a plaintiff alleging the negligence of a public entity has the burden to prove that the public entity had actual or constructive notice of the dangerous condition. *Id.* Whether a public entity possessed notice is generally a question of fact to be resolved by the jury. However, "it may be resolved by the trial court as a matter of law when the facts are not in dispute and only one

- 22 -

reasonable inference can be drawn from the undisputed facts." *Barr*, 2016 IL App (3d) 150014, ¶ 22.

¶ 74 Here, plaintiff asserts that the evidence, when viewed in the light most favorable to it, is "more than sufficient for a jury to find that the Village had notice of the condition of the water service line." Specifically, plaintiff argues that the "long history of leaks" on the water service line at issue was sufficient to put the Village on notice of the condition of the water service line. In support, plaintiff points to its water service expert, Paul Fleming's, affidavit in which he identified a total of seven prior water leaks in the portion of the water main located near 717 Parkwood Avenue in a six-year period. Fleming then opined that based on the prior leaks, "the Village knew or should have know that the water service line was potentially degraded and could pose a risk of continued leaking, and [it] should have take action prior to September 9, 2010[,] to investigate the water service line for potential degradation." As discussed, the record contains no indication of the exact locations of the leaks. At least three of the prior leaks occurred somewhere on defendant's property. Further, the record does not identify the causes of the prior leaks. Moreover, the Village's Public Works Director, Dan Bromberek, testified in his discovery deposition that the Village had no knowledge that the water service line was corroding. In fact, in January 2010, just 18 months before the leak at issue here, public work employees physically observed a portion of the water service line that was exposed for an unrelated sewer line repair. The exposed line was located approximately six to seven feet west of the oil pipeline. At that time, public work employees observed no leaks, corrosion, or other defects.

¶ 75 Finally, both Fleming and plaintiff's expert in metallurgy, John Beavers, testified in their discovery depositions that the cause of the oil leak in this case was "unusual" and "rare." Fleming conceded that the Village possessed no prior knowledge that the oil pipeline and the water service

line were only separated by six inches. Fleming further stated there was "[n]o way [the Village] would have known" about the water leak or its impingement on the oil pipeline.

¶ 76     Based on the above, the trial court appropriately granted summary judgment in favor of the Village.

¶ 77                                    III. CONCLUSION

¶ 78     For the foregoing reasons, we reverse the judgment of the circuit court of Will County denying defendant's motion for judgment notwithstanding the verdict on the breach of contract claim, and remand with instructions that the court enter judgment notwithstanding the verdict in favor of the defendant on the contract claim and the claims arising out of negligence. We affirm on all other grounds.

¶ 79     Reversed in part and affirmed in part; remanded with instructions.