**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 210266-U

Order filed April 21, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| MARTHA NEWKIRK, as Special Administrator of the Estate of WAYNE TUNTLAND, Deceased, and TOBY JOHNSON, as Special Administrator of the Estate of DAVID JOHNSON, Deceased, | ) ) ) ) ) ) | Appeal from the Circuit Court of the 13th Judicial Circuit, LaSalle County, Illinois, |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) ) | Appeal Nos. 3-21-0266 3-21-0297 Circuit Nos. 17-L-67 18-L-98 |
| JOSEPH LESLIE, NICOLE LESLIE, DUSTIN HICKEY, and JENNA HICKEY, | ) ) ) | |
| Defendants | ) ) ) | Honorable |
| (Joseph Leslie and Nicole Leslie, Defendants-Appellees). | ) ) | Joseph P. Hettel, Judge, Presiding. |

_____

JUSTICE HOLDRIDGE delivered the judgment of the court.
Justices McDade and Schmidt concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*: The circuit court did not err as a matter of law when it granted the motion for summary judgment.

¶ 2     Martha Newkirk, as special administrator of the estate of her father, Wayne Tuntland, and

Toby Johnson, as special administer of the estate of his husband, David Johnson, both filed complaints against Joseph Leslie, Nicole Leslie, Dustin Hickey, and Jenna Hickey founded in negligence. The matters were consolidated. The Leslies filed a motion for summary judgment against both Martha and Toby's claims, which the circuit court granted. The court made a finding pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), and this appeal followed.

¶ 3                                    I. BACKGROUND

¶ 4        During the late afternoon on February 28, 2017, a tornado traveled through Ottawa, Illinois. The National Weather Service rated the tornado on the Enhanced Fujita Scale as an EF-3 and noted that it had a path length of 11.5 miles, maximum width of 800 yards, and estimated peak winds of 144 miles per hour. The National Weather Service, *February 28, 2017; Tornado Event*, https://www.weather.gov/lot/2017Feb28_tornadoes (last visited Apr. 12, 2022). The National Weather Service summarized the event:

> "The first area of significant damage in the EF2 range was in the area around the La Salle County Nursing Home and La Salle County Highway Department, with lighter damage upstream from this location. The tornado continued into Naplate and produced widespread EF2 damage to numerous homes. EF3 damage also was identified in two locations. The first was where a minivan was thrown about 30 yards and a home was lifted off its foundation and left with only its interior walls intact. The second was at the Pilkington Glass plant where one section of the factory was completely destroyed. The tornado then crossed the Illinois River and moved through the south side of Ottawa, producing an 800 yard wide path of EF1 damage to trees and homes. The fatalities in Ottawa occurred from a tree falling onto two men who were working outside. The tornado then crossed the Illinois

2

River again and continued to produce EF1 and EF0 damage as it exited Ottawa, finally dissipating in the area northwest of Marseilles." *Id.*

¶ 5 Wayne and David were the two individuals who died when several branches from a tree fell on them. They were outside on Wayne's property when branches from a hackberry tree next door on the Leslies' property fell on them. The Leslies purchased their home from the Hickeys just a month and a half prior to the tornado on January 13, 2017. Martha and Toby brought the instant actions founded in negligence against the Leslies, alleging that they were negligent in maintaining and monitoring the tree. They also filed the same claims against the Hickeys and added an allegation that the Hickeys failed to warn the Leslies of the condition when selling the property.

¶ 6 The Leslies denied liability and asserted affirmative defenses in the alternative. First, they argued that harm was the result of an act of God. Second, they argued contributory negligence in that the decedents failed to keep a proper lookout, failed to watch where they were walking, were outside when they knew or should have known it was unsafe to do so despite the visible and audible warnings of a tornado, and they were otherwise careless and negligent. The Leslies and the Hickeys filed countercomplaints against each other for contribution.

¶ 7 The Leslies subsequently filed a motion for summary judgment and raised four arguments: (1) the tornado was an act of God; (2) the tree was a condition, not a cause; (3) they had no notice of any deficiencies on their property; and (4) they owed no duty of care because the likelihood of injury and the foreseeability of injury were low. The Leslies attached the report from the National Weather Service (*id.*) and the depositions of Toby, Martha, and the Leslies to their motion.

¶ 8 In Martha and Toby's response to the Leslies's motion for summary judgment, they argued that the inspection report put the Leslies on notice that the tree needed to be monitored but that they took no action from the date of the inspection and the date of the tornado to inspect the tree.

3

They attached a copy of a property inspection report that was issued on December 1, 2016, and performed by a duly licensed real estate inspector. A section of the report provided for notes on vegetation. The inspector noted "Tree limbs over hang [*sic*] the roof and should be cut back. Huge tree in rear noted. Monitor for wood rot." The inspector rated the vegetation as "acceptable." The report defined acceptable as "[f]unctional with no obvious signs of defect." The other possible rating options were "not present," "not inspected," "marginal," and "defective." Also attached to the response were the Leslies's depositions. Of particular relevance, Nicole testified that she did not take any action with the subject tree after the property inspection because the inspector rated the tree "acceptable." Joseph was the only one living at the house at the time of the tornado as Nicole stayed in Bloomington with her daughter until the school year ended. Joseph testified that he understood the inspector's note that he should watch the subject tree for rot and provided that he would be able to recognize tree rot. However, he did not observe the subject tree up close for wood rot but stated that he could see it outside a window. Joseph stated that, prior to the tornado, he did not observe any falling branches from the tree.

¶ 9 Martha and Toby also included a tree risk assessment report. They retained Mark Duntemann, an International Society of Arboriculture board-certified master arborist, to determine the risk associated with the tree. He visited the site on April 31, 2017, and observed that a large portion of the crown of tree had failed and was laying on the ground and estimated that the minimum height of the tree before the tornado was 75 feet. Duntemann opined that the tree had significant structural issues that were visually observable from the ground that were present for several years. He stated that the overall risk rating prior to the wind event on February 28th was high but the wind event moved the rating to extreme. Duntemann stated that a reasonable and prudent response to the pre-storm risk rating would have been to remove the tree. He founded this

opinion on the following observations: a shear crack in the trunk associated with extensive internal decay compromised the structural integrity of the trunk, a history of past failures that exposed large open cavities and decay columns throughout the secondary and tertiary branches, woundwood at large secondary branches indicating poor branch unions, rams-horn features that indicated woundwood growing into cavities, and cavity openings that made internal cavities visible. Based on these observations, the size of the branches associated with the defects, the height of the tree, and the presence of three residential homes within the tree's risk zone, the pre-storm risk rating was "high" based on a one-year time frame.

¶ 10    Following a hearing, the court found that the Leslies did not owe a duty of care. It stated:

> "[B]ased on the facts I have in front of me, clearly the action—the only action that could have been done, based on the record, would be to cut down the tree immediately upon purchasing the home. 75-foot-trees fall in high winds, and it was close enough to the property line to be able to fall and cause at least property damage to the neighbors. Is that what the law requires? I don't think so.
>
> While the deposition testimony of Joseph and Nicole was used to argue that they were aware from the inspection report that they should inspect the tree for rot, there was nothing in the report that gave them knowledge that there was rot. In fact, the tree was marked acceptable. I think a fair reading of that is, you have a big tree in your backyard, and you should inspect it for rot because rot could cause branches to fall and cause injury.
>
> In this particular case, it was only 45 days after they moved in that injury was caused. So I can find that they had no duty to inspect that tree before this tornado came along. Having no duty to inspect the tree before the tornado came along, they did not breach a duty. And if they did not breach a duty, they cannot be liable for the damages."

Therefore, the court granted the motion for summary judgment. The Leslies asked the court for a Rule 304(a) finding, which it also granted, finding that there was no just reason for delaying either enforcement or appeal or both. Martha and Toby appeal.

¶ 11                                             II. ANALYSIS

¶ 12        On appeal, Martha and Toby argue that the court erred when it granted summary judgment in the Leslies's favor. Summary judgment is appropriate only if "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Jackiewicz v. Village of Bolingbrook*, 2020 IL App (3d) 180346, ¶ 22. A plaintiff is not required to prove his case to survive a motion for summary judgment, but rather, he must present a factual basis that would arguably entitle him to judgment. *Daniels v. Corrigan*, 382 Ill. App. 3d 66, 70 (2008). However, "the court should grant summary judgment only if the movant's right to a judgment is clear and free from doubt." *Andrews v. Metropolitan Water Reclamation District of Greater Chicago*, 2019 IL 124283, ¶ 20. On review, we must determine whether a genuine issue of material fact existed that should have precluded dismissal of the case, or absent an issue of fact, whether summary judgment was proper as a matter of law. *Id.* We review a circuit court's entry of summary judgment *de novo* (*Enbridge Energy, Limited Partnership v. Village of Romeoville*, 2020 IL App (3d) 180060, ¶ 69), and we may affirm the granting of summary judgment on any factual basis supported by the record. *Harlin v. Sears Roebuck & Co.*, 369 Ill. App. 3d 27, 32 (2006).

¶ 13        Martha and Toby's claims were founded in negligence. To establish a cause of action for negligence, they were required to establish the Leslies owed a duty of care, the Leslies breached that duty, and an injury proximately caused by the breach. See *C.H. v. Pla-Fit Franchise*, *LLC*, 2017 IL App (3d) 160378, ¶ 16. The court held that the Leslies did not owe a duty of care. Whether

6

a duty of care exists is a question of law to be determined by the court, and thus, may be determined on a motion for summary judgment. *Curatola v. Village of Niles*, 154 Ill. 2d 201, 207 (1993).

¶ 14 In determining whether a duty exists, well established case law provides the consideration of the following four factors: (1) foreseeability of injury, (2) likelihood of injury, (3) magnitude of the burden on the defendant to guard against the injury, and (4) consequences of placing a burden on the defendant. *Smith v. Purple Frog, Inc.*, 2019 IL App (3d) 180132, ¶ 21. Generally, we balance the foreseeability and likelihood of harm against the burdens and consequences of imposing a duty on the defendant for the benefit of the plaintiff. *Hutchings v. Bauer*, 149 Ill. 2d 568, 571 (1992). The weight accorded to these factors depends on the circumstances of a given case. *Bruns v. City of Centralia*, 2014 IL 116998, ¶ 14.

¶ 15 The first two factors, the foreseeability and likelihood of injury, do not lend toward imposing a duty. Martha and Toby argue that it is clear that the Leslies had constructive knowledge that the tree posed a danger, thereby making the foreseeability and likelihood of injury high. They rely on the property inspection report recommendation to monitor the tree for rot, Joseph's testimony that he had the ability to recognize wood rot but never looked at the tree, Duntemann's tree risk assessment report that described signs of wood rot, and the size of the tree.

¶ 16 We find that the Leslies did not have constructive knowledge. "One will be considered to have constructive knowledge if he receives facts that would make the dangerous condition known to any ordinary prudent person." *Stackhouse v. Royce Realty & Management Corp.*, 2012 IL App (2d) 110602, ¶ 30. The property inspection report provided that the tree was acceptable, which was defined as "[f]unctional with no obvious signs of defect," and recommended that the Leslies monitor it for wood rot. If the inspector, a few weeks prior to the tornado, was unable to detect qualities in the tree that would have rated it anything other than acceptable, it is unreasonable to

7

conclude that the Leslies should have reached a different conclusion. It is true that Joseph provided that he could identify wood rot and that he did not observe the tree up close. However, he stated that he could see the tree from his window and did not observe any fallen limbs before the tornado. It is also unclear how Duntemann's tree risk assessment report can support constructive knowledge because, as noted by the Leslies, the report (1) made numerous notes of internal structural deficits that were exposed after the tornado and (2) failed to connect how a master arborist's observations can stand for the proposition that two lay persons should have known the same.

¶ 17    Martha and Toby cite various cases to support their position but we find they are inapposite. See *Ortiz v. Jesus People, U.S.A.*, 405 Ill. App. 3d 967 (2010) (the defendant was aware that his tree had a large branch that hung over a public walkway); *Eckburg v. Presbytery of Blackhawk of Presbyterian Church (USA)*, 396 Ill. App. 3d 164 (2009) (the circuit court erroneously decided issues of fact when ruling on a section 2-619 motion to dismiss); *Stackhouse*, 2012 IL App (2d) 110602, ¶ 31 (the defendant knew that a tree was possibly diseased).

¶ 18    Here, the tornado was an act of God that could not have been prevented. See *Hoggatt v. Melin*, 29 Ill. App. 2d 23, 31 (1961) (an act of God is an inevitable act that cannot be prevented by human care, skill, or foresight); see also *Dukich v. Illinois Workers' Compensation Comm'n*, 2017 IL App (2d) 160351WC, ¶ 42 (acts of God include lightning strikes and tornadoes). The National Weather Service reported that prior to this tornado, "[t]here had only been one wintertime tornado on record in LaSalle County, and that was an EF-3 on December 6, 1951[,] that caused one fatality and one injury." National Weather Service, *February 28, 2017; Tornado Event*, https://www.weather.gov/lot/2017Feb28_tornadoes (last visited Apr. 12, 2022). The tree was subjected to winds of 155 miles per hour. The tornado and surrounding weather conditions were unforeseeable and unlikely based on LaSalle County's historical weather data.

8

¶ 19    Regarding Martha and Toby's position that the size of the tree provided a foreseeability and likelihood of injury, they cite no relevant authority and are essentially suggesting a strict liability analysis, which we find inapplicable. See *Traube v. Freund*, 333 Ill. App. 3d 198, 202 (2002) ("[a] defendant who performs an abnormally dangerous or ultrahazardous activity is subject to liability for harm to the person, land, or chattels of a plaintiff resulting from the activity even though the defendant has exercised the utmost care to prevent the harm").

¶ 20    We also find that the last two factors, the magnitude of the burden on the defendant to guard against the injury and the consequences of placing a burden on the defendant, weigh heavily against finding a duty in this case. The magnitude of the burden of guarding against injury would be onerous and have harsh consequences for landowners, especially here, where the Leslies did not have actual or constructive notice of any deficiency with the tree and the injuries occurred during an act of God. The only remaining consideration pertains to the mere size of the tree. This presents a similar circumstance that was considered by this court in *Pageloff v. Gaumer*, 365 Ill. App. 3d 481 (2006). In that case, the plaintiff was camping on the defendants' campground when she stepped on a walnut and fell. *Id.* at 482. This court found that imposing such a burden on a landowner would mean that landowners could not have walnut trees on campgrounds. *Id.* at 484. Here, a similar burden would occur where a landowner could not have a large tree on his property.

¶ 21    Accordingly, we find that the circuit court did not err as a matter of law when it found that the Leslies did not owe a duty and granted summary judgment in their favor.

¶ 22                                III. CONCLUSION

¶ 23    For the foregoing reasons, the judgment of the circuit court of LaSalle County is affirmed.

¶ 24    Affirmed.